**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JEREMY R.,<br><br>             Plaintiff,<br>    v.<br><br>KILOLO KIJAKAZI, ACTING<br>COMMISSIONER OF SOCIAL SECURITY,<br><br>           Defendant. | Civ. A. No. 3:21-cv-19095 (GC)<br><br>**MEMORANDUM OPINION** |

**CASTNER, District Judge**

**THIS MATTER** comes before the Court upon Jeremy R.'s ("Plaintiff") appeal from the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C § 423, *et seq.*, and for supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381, *et seq.*[1] The Court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g), and does so in accord with Local Civil Rule 9.1.

After careful consideration of the entire record, including the administrative record, as well as the parties' submissions, the Court reaches its decision without oral argument pursuant to Federal Rule of Civil Procedure 78, Local Civil Rule 78.1, and Local Civil Rule 9.1(f). For the reasons set forth below, the Court reverses the Commissioner's decision to deny Plaintiff social

---

[1] "The standard for determining whether a claimant is disabled is the same for both DIB and SSI." *Searles v. Comm'r of Soc. Sec.*, No. 18-15804, 2019 WL 6337890, at *1 n.3 (D.N.J. Nov. 27, 2019) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 551 n.1 (3d Cir. 2005)).

security benefits, and remands the action for further proceedings consistent with the findings stated herein.

I.    **BACKGROUND**

    A.    **Procedural History**

Plaintiff filed an application for DIB and SSI on January 17, 2017, alleging disability beginning on July 16, 2012. (Administrative Record ("AR") 442-51.) Plaintiff's claim was denied initially on March 30, 2017 (*id.* at 284-93), and again upon reconsideration on July 25, 2017 (*id.* at 300-05). On August 16, 2017, Plaintiff completed his request for a hearing before an Administrative Law Judge ("ALJ") well within the sixty (60) day window provided by the notice (*id.* at 305-10), but on October 5, 2017, the Hearing Office sent Plaintiff a letter that his request was untimely filed (*id.* at 311), followed by the entry of an Order of Dismissal on November 20, 2017 (*id.* at 245-49). Plaintiff appealed this determination (*id.* at 312-13), and on May 2, 2018, the Administrative Appeals Council vacated the dismissal because Plaintiff's appeal had clearly not been filed out of time (*id.* at 251-52).

An Administrative Hearing was held on October 4, 2018 (*id.* at 159-94), and the ALJ issued a decision on January 16, 2019, rendering a partially favorable determination (*id.* at 253-273). Plaintiff sought the review of the Appeals Council (*id.* at 374-75), and on June 10, 2020, the Appeals Council remanded the case to the ALJ, finding that the original decision was not supported by substantial evidence (*id.* at 278-80). In accord with the remand order, a subsequent hearing was conducted on November 17, 2020 (*id.* at 130-58), followed by a decision issuing a full denial of benefits on January 28, 2021 (*id.* at 110-27). Plaintiff again petitioned for review (*id.* at 438-40), which was denied on August 20, 2021 (*id.* at 1-4).

On October 20, 2021, Plaintiff filed an appeal to the District Court for the District of New

Jersey pursuant to 42 U.S.C. § 405(g).  (*See* ECF No. 1.)  The Commissioner filed the Administrative Record on December 27, 2021.  (*See* ECF No. 5.)  Plaintiff filed his moving brief on August 23, 2021, pursuant to Local Civil Rule 9.1.  (*See* ECF No. 11.)  The Commissioner filed opposition on October 7, 2022 (*see* ECF No. 12), and Plaintiff did not reply.

**B.**    **Factual Background**

Plaintiff is a forty-six year-old male born on February 16, 1976.  (AR 442.)  He is a high school graduate.  (*Id.* at 485.)  He reported that he has been employed installing custom stairs, as a driver for a car service, on the night crew for ShopRite stocking shelves, and as a pest control technician.  (*Id.* at 485, 500-05.)  Plaintiff has received treatment for various conditions, mostly centering around difficulty with his right shoulder, but also including problems with his lower back, left knee, and right elbow, and he previously sustained fractures to his left tibia, left wrist, and fingers.  (*Id.* at 773, 811.)

In 1999, Plaintiff sustained a work-related injury while lifting at ShopRite/Pathmark, and had undergone nine (9) subsequent corrective operations when he was re-injured in 2012.  (*Id.* at 773, 792.)  While working as an exterminator on July 16, 2012 (*id.* at 631, 634, 637, 649, 652, 676), "he was spraying pesticide outside the window of a moving truck[, and] the sprayer he was holding hit a tree branch causing a traumatic injury to [Plaintiff's] right shoulder" (*id.* at 844).  In the aftermath of this second work-related injury to his right shoulder, he underwent corrective surgery on May 21, 2013.  (*Id.* at 721-24.)  Plaintiff's next surgery was performed in January 2016.  (*Id.* at 796.)  He continues to seek treatment for dislocation, pain, and instability in his right shoulder.  (*Id.* at 805-808, 828.)  On March 19, 2017, Plaintiff was treated in the emergency room for left knee pain (*id.* at 765-72), and on May 30, 2018, he sought treatment for carpel tunnel syndrome as well as right shoulder pain.  (*Id.* at 102).  An MR arthrogram taken on March 29,

3

2017, a CT scan performed on May 29, 2018, and x-rays taken on April 22, 2019, indicated a major recurrent rotator cuff tear (*id.* at 24), and on December 11, 2019, Plaintiff had another operation to correct it (*id.* at 39-42). He was also admitted to the hospital on December 14, 2019 for pneumonia (*id.* at 28). Though he initially reported improvement, Plaintiff suspended his physical therapy sessions during the COVID-19 pandemic because he was immunocompromised by his asthma, which set his progress back. (*Id.* 30-38, 66, 70.) Plaintiff has been prescribed oxycodone, naprosyn, baclofen, and valium for his conditions. (*Id.* at 580, 720.)

At the initial hearing, conducted on October 4, 2018 (*id.* at 159), Plaintiff stated that the quality of his right shoulder had degraded since his surgery in 2016, that he is unable to use his arm, and that he "has permanent restrictions where [he] can't lift his arm above shoulder height" (*id.* at 172-73). He explained that an incident during physical therapy caused him to stop his exercises, and that while moving a laundry basket a month later, he felt his shoulder "completely tear again" (*id.* at 174), and that "basically, [his] arm is useless to [him] now" (*id.* at 175). Plaintiff testified that in addition to problems with his right shoulder, and an emergency room visit for inflammation in his left knee, he had prior back surgery and prior surgery on his right knee. (*Id.* at 180.) He testified that while he was accustomed to an active lifestyle before his injuries, he now lays in bed, is unable to sit for long periods of time without taking breaks, and that the pain medication he needs prevents him from "do[ing] normal tasks with regularity." (*Id.* at 191-92.)

At the second Administrative Hearing, conducted on November 17, 2020 in accord with the Appeals Council's remand order, Plaintiff indicated that his most recent surgery did not result in marked improvement because its purpose was stabilization, and because the two surgeries immediately prior "were worthless, and the only way to try to stabilize the shoulder was by doing an Achilles transfer." (*Id.* at 138-39.) He testified that "since [his] original injury [in 1999], [he's]

had [his shoulder] pop out over 100 times[.]." (*Id.* at 139-40.) He is not able to lift any weight with his right arm. (*Id.* at 140.) He emphasized that while his right shoulder injury was the most pronounced currently, when it is substantially resolved, he may need back surgery. (*Id.* at 142.) He stated that in the past eleven (11) years since his initial laminectomy, the degeneration of his discs above the surgically repaired area have "gotten significantly worse." (*Id.* at 144.) Plaintiff stated that his back prevents him from sitting at a desk all day. (*Id.* at 142.) He reported that he is treated with pain medication, muscle relaxers, and anti-inflammatory medications to manage the pain in his shoulder, back, and knee. (*Id.* at 144.)

Plaintiff was able to detail the background behind his many surgeries, and provide a more fulsome explanation as to why he has had to undergo so many operations. He stated that after a shoulder surgery performed in 2005, his surgeon, Dr. Borgatii, explained that "if [his] subscap ever tore again, it was going to be worthless to fix, and [he] was going to need a pectoralis transplant." (*Id.* at 147.) Before his first surgery following his 2012 injury, he informed his surgeon, Dr. Spagnuola, of Dr. Borgatii's prior determination, but Dr. Spagnuola believed that the method of surgery had evolved during the interim seven (7) years, and that it would be beneficial. (*Id.*) After the surgery, in line with Dr. Borgatti's prior conclusion, Dr. Spagnuola opined that Plaintiff would need a pectoralis transplant because "at this point fixing the subscap tendon was going to be worthless." (*Id.* at 146.) Because Dr. Spagnuola did not perform pectoralis transplants, Plaintiff stated that he "was specifically sent to Dr. Sidor to have a pectoralis transplant," and that "not one time when [he] talked to Dr. Sidor during his treatment and visits or whatnot, was there anything discussed other than doing the pectoralis transplant." (*Id.* at 146-47.) Plaintiff relayed that when he awoke from the second surgery, however, he learned that Dr. Sidor did not do the pectoralis transplant, but "just fixed the subscap again." (*Id.* at 147.) Plaintiff stated that he

informed Dr. Sidor that he had torn his shoulder during physical therapy, but that Dr. Sidor refused to investigate with an MRI. (*Id.*) Plaintiff testified that he used personal insurance to get an MRI to evidence the tear, that the MRI indeed proved that his shoulder was torn again, and that he was then referred to his most recent surgeon, Dr. Abrams. (*Id.* at 139, 148.) Plaintiff asserted that Dr. Abrams "agreed immediately that the previous two surgeries that [he] had were worthless and recommended [Plaintiff] [have] the very rare Achilles tendon transfer into [his] shoulder which would graft into [his] bone and be used to hopefully try to stabilize [his] shoulder[.]" (*Id.* at 148.) Dr. Abrams also opined that Plaintiff would be sacrificing strength and mobility in exchange for stability. (*Id.*) Plaintiff further testified, "with all that being said, Dr. Abrams has also told [him] that [he] ha[s] to prepare [himself] that this will not be [his] last surgery" because he has "an extensive amount of arthritis in his shoulder" and that "at a minimum [he] is going to need a shoulder replacement surgery in the future," in addition to other potential surgeries on his rotator cuff and labrum. (*Id.*)

The ALJ engaged the expertise of Vocational Expert (the "VE"), Jeanne Carbonetti, who testified that there exists sufficient work available in the national economy at the light work[2] level,

---

[2] The Social Security Administration "determine[s] the physical exertion requirements of work in the national economy" by "classify[ing] jobs as sedentary, light, medium, heavy, and very heavy." Accordingly, "light work,"

> involves lifting no more than 20 pounds at a time with frequent lift-
> ing or carrying objects weighing up to 10 pounds. Even though the
> weight lifted may be very little, a job in this category when it re-
> quires a good deal of walking or standing, or when it involves sitting
> most of the time with some pushing and pulling of arm or leg con-
> trols. To be considered capable of performing a full or wide range
> of light work, you must have the ability to do substantially all of
> these activities. If someone can do light work, we determine that he
> or she can also do sedentary work, unless there are additional limit-
> ing factors such as loss of fine dexterity or inability to sit for long
> periods of time.

accounting for restrictions[3] related to a major right shoulder impairment, in the form of: usher, Dictionary of Occupational Titles ("DOT") Code 344.677-014; investigator, dealer accounts, DOT Code 241.367-038; and school bus monitor, DOT Code 372.667-042.  (*Id.* at 150-51.)  The ALJ solicited further testimony, however, that an additional limitation that the individual "never carries anything more than five pounds on that right arm," would eliminate all three of the selection jobs, in addition to all other jobs in the national economy at the light level.  (*Id.* at 152.)  The VE provided that the individual would be able to perform two jobs at the sedentary level:[4] call out operator, DOT Code 237.367-014; and election clerk, DOT Code 205.367-030.  (*Id.* at 153.)  The VE stated that if an individual were restricted such that he could not lift anything, not even five

---

20 C.F.R. §§ 404.1567(b); 416.967(b).

[3] The ALJ posed the hypothetical restrictions to the VE as follows:

> I'd like you to assume a hypothetical individual of [Plaintiff's] age and education with the past job you described [an exterminator, performed at the heavy level, skilled with an SVP of 5].  I'd like you to further assume this individual is limited to light work except he can never reach overhead with the right.  For all other reaching, he could reach frequently [or occasionally] to the right, but never above shoulder level.  He can never climb ladders, ropes, or scaffolds; and he can never crawl. . . He can occasionally crouch and stoop.

(AR 151, 153.)

[4] According to the Social Security Administration, "sedentary work"

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

(5) pounds, there would be no employment available for that person in the national economy. (*Id.* at 154-55.) In response to an inquiry by Plaintiff's counsel, the VE testified that an additional limitation that an individual must frequently switch between sitting and standing would not impact the jobs at the sedentary level. (*Id.* at 156.) Before the hearing was concluded, Plaintiff stated that he "can't sit for long periods of time[], and [] can't stand for long periods of time[]," and that "bending over, sitting, or standing for long periods of time in one place is also a major issue with [his] back." (*Id.* at 156-57.)

### C.    The ALJ's Decisions

The ALJ initially determined, in a decision rendered January 16, 2019, that Plaintiff was disabled under the Social Security Act from July 16, 2012 through August 17, 2016, but that "[o]n August 18, 2016, medical improvement occurred that is related to the ability to work, and [Plaintiff] has been able to perform substantial gainful activity from that date through the date of this decision." (*Id.* at 257.) Plaintiff appealed this partially favorable determination, and in its vacation and remand order, the Appeals Council identified several deficiencies with the ALJ's initial decision. (*Id.* at 278-80.)

First, the Appeals Council concluded that "the record contains opinions that contradict the residual functional capacity [("RFC")] assessment during this period, which were not considered in the hearing decision." (*Id.* at 278.) The ALJ determined that Plaintiff retained the ability to perform light work, except that he "is never able to lift or reach with the right arm and would be off task 20 percent of the day due to pain." (*Id.*) Specifically, the Council found that treating physician Dr. C.J. Spagnuola's opinion, indicating a greater RFC, was not contrasted with other medical evidence in the decision, and that the ALJ had provided "no rationale for the finding that [Plaintiff] would be off task 20 percent of the workday." (*Id.*) Next, the Council considered the

8

ALJ's finding that medical improvement had occurred on August 18, 2016, which appeared to be based on an August 2016 functional capacity evaluation, and subsequent exam findings and objective test studies. (*Id.* at 279.)  The Council's review of the record evidence revealed that

> exam findings of a decrease in range of motion of the right shoulder, instability, decreased strength, and pain do not significantly differ from exam findings dated during the period in which Dr. Spagnuola's work restrictions were placed and during the period in which the [Plaintiff] was found to [be] disabled.  Further evaluation of [Plaintiff's RFC] assessment during the entire period at issue while giving consideration to Dr. Spagnuola's opinions is required.

(*Id.*)   The Appeals Council directed that, upon reconsideration, the ALJ must: (1) "obtain additional evidence concerning Plaintiff's impairments to complete the administrative record"; (2) "if necessary, obtain evidence from a medical expert related to the nature and severity of and functional limitations resulting from [Plaintiff's] impairment"; (3) "[g]ive further consideration to [Plaintiff's] maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations," paying particular attention to the medical opinions of Dr. Spagnuola, and discussing the relative weight provided to his opinions; and (4) "[i]f warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the [Plaintiff's] occupational base." (*Id.*)

On January 28, 2021, the ALJ issued a subsequent decision in accord with the Appeals Council's directives, finding that Plaintiff is not disabled. (*Id.* at 113-23.)  The ALJ found that Plaintiff met the insured status requirements under the Social Security Act through September 30, 2014. (*Id.* at 116.)  The ALJ then set forth the Social Security Administration's five-step sequential process for determining whether an individual is disabled.  (*Id.* at 116-123.)  At step one of the

analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity[5] since July 16, 2012, the date of Plaintiff's injury while working as an exterminator, and the alleged disability onset date. (*Id.* at 116.) At step two of the analysis, the ALJ found that Plaintiff had the following severe impairments: lumbar spine degenerative disc disease; dysfunction of major joints of the right shoulder; and obesity. (*Id.*) The ALJ found his left knee sprain and history of right knee medial meniscal tear and synovitis to be nonsevere impairments. (*Id.*)

At step three, the ALJ determined, after a comprehensive examination of Plaintiff's medical conditions, that none of Plaintiff's impairments, or combination of impairments, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (hereinafter, "Appendix 1"). (*Id.* at 116-17.) The ALJ next found that Plaintiff possessed the RFC to perform light work, "except never reach overhead with the right; occasionally reach with the right in all other directions but never above shoulder level; never climb ladders, ropes, or scaffolds, and never crawl." (*Id.* at 117.) At step four, the ALJ found Plaintiff incapable of performing past relevant work. (*Id.* at 121.) The ALJ concluded that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Plaintiff] is 'not disabled,' whether or not the [Plaintiff] has transferable job skills." (*Id.* at 122.) At step five, relying on the testimony of the VE, the ALJ found that there are jobs that exist in significant numbers in the national economy

---

[5] "Substantial gainful activity is work activity that is both substantial and gainful." 20 C.F.R. §§ 404.1572, 416.972. Substantial work activity "involves doing significant physical or mental activities. [A claimant's] work may be substantial even if it is done on a part-time basis or if [he] do[es] less, get[s] paid less, or ha[s] less responsibility than when [he] worked before." *Id.* §§ (a). "Gainful work activity is work activity that the claimant do[es] for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized." *Id.* §§ (b).

that Plaintiff can perform considering his age, education, work experience, and RFC, such as usher, investigator, and school bus monitor.  (*Id.* at 122-23.)  The ALJ then concluded that Plaintiff had not been disabled from July 16, 2012, through the date of the decision.  (*Id.* at 123.)

## II.    LEGAL STANDARD

### A.    Disability Determination

An individual is "disabled" and therefore eligible for benefits if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C.  §§ 423(d)(1)(A), 1382c(a)(3)(A).  The individual's impairment must be severe to the point that the individual cannot engage in his previous work or in "any other kind of substantial gainful work which exists in the national economy," *i.e.*, work that exists in significant numbers either in the region where such individual lives or in several regions of the country.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).  A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner employs a five-step sequential evaluation process for disability claims. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The claimant bears the burden of proof for the first four steps of the analysis, and the burden shifts to the Commissioner for the fifth step.  *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007); *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

First, a claimant must not have engaged in substantial gainful activity since the alleged disability onset date.  20 C.F.R. § 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).  Second, the Commissioner considers "the medical severity of [the claimant's] impairment(s)."  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The claimant must have a "medically determinable impairment" or combination of impairments severe enough to limit the claimant's ability to perform basic work activities for a continuous period of at least twelve months.  *See id.*; *see also id.* §§ 404.1509, 416.909.  The claimant bears the burden of establishing the first two requirements, and failure to satisfy either automatically results in denial of benefits.  *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).  If the claimant satisfies his burden at steps one and two, he proceeds to the third step.  At step three, the Commissioner considers the "medical severity of [the claimant's] impairment(s)."  *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  The impairment or impairments must meet or equal a listing in Appendix 1 of C.F.R. Part 404, Subpart P.  *Id.* §§ 404.1520(d), 416.920(d).  The impairment or impairments are "medically equivalent to a listed impairment . . . if [they are] at least equal in severity and duration to the criteria of any listed impairment."  *Id.* §§ 404.1526(a), 416.920(a).  If the claimant is able to make a sufficient showing at step three, he is deemed disabled.  *Id.* §§ 404.1520(a)(iii), 416.920(a)(iii).

However, if the claimant fails to make a sufficient showing at the third step, the analysis proceeds to an evaluation of the claimant's RFC and past relevant work at the fourth step.  *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  RFC is the most the claimant can do in a work setting despite his limitations.  *Id.* §§ 404.1545(a)(1), 416.945(a)(1).  The Commissioner "assess[es] [the claimant's RFC] based on all the relevant evidence in [his] case record," and "consider[s] all of [the claimant's] medically determinable impairments," including ones that are not "severe" pursuant to §§ 404.1520(c), [416.920(c),] 404.1521, [416.921,] 404.1523[, and 416.923].  *Id.*

§§ 404.1545(a)(2), 416.945(a)(2).  The Commissioner assesses RFC based on "all of the relevant medical and other evidence."  *Id.* §§ 404.1545(a)(3), 416.945(a)(3).  "The claimant bears the burden of demonstrating an inability to return to [his] past relevant work."  *Plummer*, 186 F.3d at 428 (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)).  Past relevant work is "work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."  *Id.* §§ 404.1560(b)(1), 416.960(b)(1).

If the claimant is incapable of performing his past relevant work, the analysis proceeds to the fifth and final step.  *See id.* §§ 404.1520(a)(4)(iv) & (v), 416.920(a)(4)(iv) & (v); *Plummer*, 186 F.3d at 428.  At step five, the claimant must be unable to adjust to other work, in light of his RFC, age, education, and work experience, to be considered disabled.  *See id.* §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g).  Before denying a claim at step five, the Commissioner must show that the claimant is capable of other work existing "in significant numbers in the national economy."  *Id.* §§ 404.1560(c)(2), 416.960(c)(2); *see also Poulos*, 474 F.3d at 92.

### B.    Standard of Review

District courts may "affirm[], modify[], or revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In reviewing the decision, the court determines whether the ALJ's findings are supported by substantial evidence.  *See id.*; *see also Poulos*, 474 F.3d at 91.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance of the evidence."  *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971) (internal quotation marks and citation omitted).

The district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Thus, this limitation on a reviewing court's discretion applies "even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). The Court must "review the record as a whole to determine whether substantial evidence supports a factual finding." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (citing *Schaudeck v. Comm'r*, 181 F.3d 429, 431 (3d Cir. 1999)). "Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981) (internal citation omitted).

## III.    DISCUSSION

Based on the Court's review of the ALJ's decision (*see* AR 113-23) in the context of the Appeals Council's remand order (*see id.* at 278-80), and the Administrative Record submitted by the Commissioner (*see generally* AR), the Court finds good cause to reverse the Commissioner's finding that Plaintiff is not disabled. Notably, in reaching a decision, an ALJ must evaluate the evidence and explain the reasons for accepting or rejecting evidence. *Cotter*, 642 F.2d at 706. Here, the Court is unable to review whether the ALJ's findings are supported by substantial evidence.

Plaintiff advances two principal arguments that the ALJ's decision is not supported by substantial evidence: (1) "having found obesity a severe impairment at Step 2 of the sequential evaluation, the decision fails to meaningfully consider obesity in the subsequent sequential steps" (*see* Pl.'s Moving Br. 9-22, ECF No. 11); and (2) "the decisional RFC is offered devoid of

evidentiary rationale, function-by-function analysis or definitional identification of light work and why Plaintiff can sustain it" (*see id.* at 22-37). The Court addresses these arguments in turn.

### A.      The ALJ's Consideration of Plaintiff's Obesity

There exists no independent listing for obesity, and so a favorable finding at Step Three will either result from (1) a finding "that an individual with obesity 'meets' the requirements of a listing if [he] has another impairment that, by itself, meets the requirements of a listing"; or (2) if there exists "an impairment that, in combination with obesity, meets the requirements of a listing." Soc. Sec. Rul. 02-1p, 2002 WL 34686281, at *5 (Sept. 12, 2002). "For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing." *Id.* This is especially true of musculoskeletal, respiratory, and cardiovascular impairments." *Id.* The regulations direct that a finding of equivalence at Step Three is appropriate "if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment." *Id.* The ALJ, however, "will not make assumptions about the severity or functional effects of obesity combined with other impairments." *Id.* at *6. "Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment." *Id.*

"[A]n ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with [his] impairments, on [his] workplace function at step three and at every subsequent step." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009). Though not required "to use particular language or adhere to a particular format in conducting [her] analysis," *Jones*, 364 F.3d at 505, an ALJ is required to "fully develop the record and explain [her] findings at step three, including an analysis of whether and why [the plaintiff's] impairments, or those

impairments combined, are or are not equivalent in severity to one of the listed impairments," *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000). "[A]bsent analysis of the cumulative impact of [the plaintiff's] obesity and other impairments on [the plaintiff's] functional capabilities, [the Court] is at a loss in [its] reviewing function." *Diaz*, 577 F.3d at 504.

"Plaintiff argues that the ALJ erred by failing to consider Plaintiff's obesity, alone and in combination with Plaintiff[']s other impairments, at step three and at every subsequent step." (Pl.'s Moving Br. 15.) He argues that the ALJ did not include an adequate discussion of Plaintiff's obesity in her decision, to wit, that her reasoning "is not articulated in the decision, obesity is not discussed, adverse impacts are not identified or ruled out, greater burdens on [P]laintiff's joint and spinal pathologies are not enumerated or eliminated, [P]laintiff's ability to sustain employment over time is not discussed or linked to any RFC finding." (*Id.* at 21-22.)

In response, the Commissioner highlights that because Plaintiff does not identify a specific listing medically equivalent to his severe impairments—to be considered in combination with his obesity— "the Court should reject Plaintiff's argument because it fails to present any basis to find harmful error." (Comm'r's Opp'n Br. 11, ECF No. 12.) Specifically, the Commissioner argues that "[a]s several cases within the District of New Jersey have persuasively explained, where a plaintiff 'does not even attempt to demonstrate that the medical findings are equal in severity to all the criteria for any Listing,' the plaintiff has failed to meet his burden of establishing a prejudicial error." (*Id.* (quoting *Farmer v. Comm'r of Soc. Sec.*, No. 19-13437, 2020 WL 6620152, at *3 (D.N.J. Nov. 12, 2020) (citing *Thomas v. Comm'r of Soc. Sec.*, No. 19-13990, 2021 WL 870745, at *8 (D.N.J. Mar. 8, 2021); *Soto v. Comm'r of Soc. Sec.*, No. 18-14165, 2020 WL 7022652, at *4 (D.N.J. Nov. 30, 2020); *Collado v. Comm'r of Soc. Sec.*, No. 19-13458, 2020 WL 593793, at *5 (D.N.J. Oct. 6, 2020); *Holloman v. Comm'r of Soc. Sec.*, No. 14-589, 2015 WL

16

1346167 (D.N.J. Mar. 25, 2015) (parenthetical explanations omitted).)   Additionally, the Commissioner submits that "Plaintiff has not pointed to a single piece of evidence that would warrant additional limitations in the RFC assessment due to his weight, nor has he shown how any additional discussion of obesity in the decision would change the outcome of this case." (*Id.* at 14.)

Essentially, the Court is tasked with deciding whether the Commissioner's duty to render a decision supported by substantial evidence outweighs a Plaintiff's "burden, on appeal, of showing not merely that the Commissioner erred, but also that the error was harmful." *Farmer*, 2020 WL 6620152, at *2.   The Commissioner correctly relates that in briefing, Plaintiff does not indicate which listings were overlooked by the ALJ, nor does he "identify any evidence of record to make some demonstration that [his] impairments, individually or in combination, met the requirements of the Listings." *Soto*, 2020 WL 7022652, at *4.   Plaintiff's lack of specificity, however, must be balanced against the fact that the ALJ does not mention obesity at all at Steps Three and Five of the sequential evaluation, and that his discussion of obesity at Step Four is at best cursory.  (AR 116, 122-23.)  Further, Plaintiff does argue for the manner of error, namely that "as in *Diaz*, Plaintiff complains of impairments which would seem 'as a matter of common sense,' to have been plausibly exacerbated by [his] obesity."  (Pl.'s Moving Br. 17 (quoting *Diaz*, 577 F.3d at 504).)  Plaintiff highlights that both his "chronically sprained left knee and arthroscopically repaired torn knee meniscus, both of which have resulted in a[] habitually limping gait, were affirmatively found to be medically determinable impairments . . . " (*id.* at 18 n.2), and notably absent is a discussion of obesity in comparison with Plaintiff's stated nonsevere impairments.  *See* 20 C.F.R. §§ 404.1523, 416.923 ("In determining whether your physical or mental impairment[(s)] are of a sufficient medical severity that such impairment[(s)] could be the basis of eligibility under

the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.").

"Here, as in Diaz, the ALJ identified Plaintiff's obesity as a severe impairment at step two, but failed to mention the condition at all at step three and only cursorily referenced it a[t] step four. This is clear error." *See Diaz*, 577 F.3d at 503-05*; see also Paladino v. Saul*, No. 18-15459, 2020 WL 525864, at *6 (D.N.J. Jan. 31, 2020); *Moore v. Comm'r of Soc. Sec.*, No. 11-5369, 2013 WL 941558, at *3 (D.N.J. Mar. 8, 2013) ("Despite the clear directives of SSR 02-1p and the Third Circuit, and despite the ALJ's own determination that [the plaintiff's] obesity, alone or in combination with her other impairments, meets or equals one of the listed impairments at step three of his analysis, as he was required to do."); *Padilla v. Astrue*, No. 10-4968, 2011 WL 6303248, at *7 (D.N.J. Dec. 15, 2011) (remanding because of ALJ's failure to discuss Plaintiff's severe obesity). "There is no way to review the ALJ's decision in this case because no reasons were given for his conclusion that [the plaintiff's] impairments in combination did not meet or equal an Appendix 1 listing." *Torres v. Comm'r of Soc. Sec.*, 279 F. App'x 149, 152 (3d Cir. 2008); *see also Babice v. Comm'r Soc. Sec.*, No. 16-6254, 2018 WL 6243045, at *7 (D.N.J. Nov. 29, 2018) ("[T]he ALJ never combined the impairments and compared them to the listed impairments. The ALJ's conclusory statements are beyond meaningful judicial review.")

"Although a plaintiff bears the burden of proving that his impairments meet those listed in Appendix 1, if a claimant's impairments do not meet the requirements of any listing, the ALJ is required to determine whether the combination of impairments is medically equal to any listed impairment." *Prince v. Comm'r of Soc. Sec.*, No. 16-4748, 2018 WL 1399306, at *5 (D.N.J. Mar. 20, 2018) (citing *Torres*, 279 F. App'x at 151-52). "As in *Torres*, the ALJ here failed to conduct the proper analysis at step three by not considering Plaintiff's impairments in combination." *Id.*

18

(citing *id.*)   As in *Prince*, "[h]ere the ALJ states—without discussion or analysis—that the 'claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.'"  *Id.*  And as in *Paladino*, "[w]ere the record unambiguous that Plaintiff's obesity did not, in combination with Plaintiff's other impairments, meet or equal a listing, then this error may have been harmless."  2020 WL 525864, at \*6 (finding the Commissioner's argument that the ALJ was not required to undertake the analysis at Step Three because "the record contains no evidence of 'functional limitations'" related to the plaintiff's obesity, and that even if the ALJ erred, the error was harmless, unavailing).  "However, whatever record evidence regarding Plaintiff's obesity, *Diaz* is clear that 'meaningful[]' discussion of severe obesity 'individually and in combination with her impairments' *is mandatory* 'at step three and at every subsequent step.'"  *Id.* (quoting *Diaz*, 577 F.3d at 503) (emphasis in original).  "Without any discussion of the effects of Plaintiff's obesity combined with Plaintiff's other impairments, . . . 'the Court cannot determine whether the combined effect of Claimant's impairments would be medically equivalent to a[] . . . listing.'"  *Id.* (quoting *Padilla*, 2011 WL 6303248, at \*7).  The Court finds that the ALJ's failure to consider Plaintiff's obesity was not harmless error.

    **B.**    **The RFC Determination**

    The RFC is "the most [a claimant] can do despite [the individual's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  Plaintiff's principal argument is that the ALJ failed to provide sufficient evaluation of the record evidence in rendering her decision.  (See Pl.'s Moving Br. 24 (citing *Plummer*, 186 F.3d at 433 & *Cotter*, 642 F.2d at 704).)  Plaintiff also contends that the ALJ's finding that Plaintiff is capable of light work is contrary to the record evidence, and out of step with Social Security Ruling ("SSR") 96-8p, explaining that,

> [P]laintiff was denied disability because the ALJ found him capable of light work. But this capability is not defined or defended. Indeed,

> the decision does not specify or in any way indicate how long plaintiff can sit stand or walk or how much he can lift and carry at any one time or during any extended period during the 8 hour workday. There is simply no finding about any of these functions. And since there is no finding, no function-by-function analysis, there is no evidentiary support for any purported work related function because there are no articulated work related functions.

(*Id.* at 32 (citing SSR 96-8p, 1996 WL 374184 (West 1996).) Finally, Plaintiff argues that without proper engagement with the record, the Court is unable to evaluate whether the ALJ has credited her speculative inferences from the medical evidence over the physicians' recorded conclusions. (*Id.* at 29-30.)

The Commissioner responds that "[i]n the RFC, the ALJ must include a claimant's 'credibly established limitations' only, not all limitations that a claimant alleges." (*See* Comm'r's Opp'n Br. 15 (quoting *Rutherford*, 399 F.3d at 552).) Next, the Commissioner argues that "SSR 96-8p does not require the ALJ to make specific findings on individual work functions, but only requires the ALJ to articulate what evidence supports the RFC determination and resolve inconsistencies in the record, as the ALJ did here." (*Id.* at 18 (citing *Bencivengo v. Apfel*, No. C.A. 99-6135, 2000 WL 875684, at *3 (E.D. Pa. June 14, 2000), *aff'd sub nom. Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153 (2000)).) Finally, the Commissioner defends that "although Plaintiff cites to evidence already considered by the ALJ and claims it supports additional limitations, this impermissible request to reweigh the evidence should be rejected." (*Id.* at 20 (citing Pl's Moving Br. 35-37 & *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011)).)

The RFC determination itself reads:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR [§§] 404.1567(b) and 416.967(b) except never reach overhead with the right; occasionally reach with the right in all other directions but never above shoulder level; never climb ladders, ropes, or scaffolds, and never crawl.

(AR 117.) Specifically directed by the Appeals Council, the ALJ gives "some weight" to the 2013 opinion notes of treating physician C.J. Spagnuola, M.D., which provided that "[i]f [Plaintiff] chooses not to have surgery, then he would remain maximally medically improved, and on permanent light duty restrictions regarding the right upper extremity[,]" (*id.* at 626), but "great weight" not afforded because it was "not a function-by-function assessment of the claimant's limitations" (*id.* at 119). The ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (*Id.*)

Here, the Court concludes that the ALJ failed to provide sufficient discussion of significant medical evidence and that the ALJ's findings are contrary to the weight of the record. The ALJ credits medical evidence that runs contrary to Plaintiff's subjective complaints of pain, recounted during the Administrative Hearings, to wit: the Functional Capacity Evaluation and Work Ability Assessment performed by Jennifer Carlisle, P.T., and Kelsey Stecklow, B.S.E. on August 17, 2016 (*see id.* at 830-43); the September 12, 2016 evaluative notes of orthopedist Michael L Sidor, M.D. during a follow-up to said assessment (*see id.* at 760-62); the February 21, 2017 treatment notes of David B. Dickerson, M.D. (*see id.* at 805-08); a record of the March 29, 2017 MR arthrogram right shoulder ordered by Dr. Dickerson subsequent to Plaintiff's February 2017 visit (*see id.* at 803-804); the evaluation of state agency consultant Deogracias Bustos (*see id.* at 231-42); the April 11, 2018 treatment notes of Jeffrey S. Abrams, M.D. (*see id.* at 796-98); and the treatment notes of various physicians, dating from March 3, 2017 through September 14, 2018 (*see id.* at 810-27). The ALJ failed to fully consider the treatment notes of Plaintiff's most recent surgeon, Dr. Abrams, summarizing that the "[t]reatment notes from Jeffrey Abrams, M.D. in April 2018 indicate positive clinical findings regarding the right shoulder but no apparent abnormalities otherwise." (*Id.* at

21

796-98.)  Upon closer inspection, Dr. Abrams notes indicate the positive clinical findings lead to

a recommendation of further surgery, and that there exist significant abnormalities:

> The patient's current diagnosis includes right shoulder instability
> anterior due to multiple instability events and humeral head
> subluxation.  Secondly, the patient has subscapularis deficiency that
> has caused him pain, weakness, and loss of function, combined with
> the first problem accentuating his instability, functional deficit.  And
> third, a concern regarding the potential for reflex sympathetic
> dystrophy or chronic regional pain syndrome with vascularity
> changes distally in the arm. . . . I have discussed the testing
> procedures.  I also discussed the operative intervention and the
> potential problems.  I feel that the patient will likely have
> permanency to his shoulder and not be returned to his normal status
> of health.  The stability issues can be improved, but his internal
> rotation strength deficient would likely be permanent.  That being
> said, his stability would likely improve his overall use of his arm
> since he has such a great degree of apprehension at this time.  The
> other potential issues regarding his multiple surgeries and occult
> infection are certainly present.

(*Id.* at 797-98.)

The ALJ next concludes that "[t]he claimant underwent various surgeries for the alleged

impairment, which certainly suggests that the symptoms were genuine.  While that fact would

normally weigh in the claimant's favor, it is offset by the fact that the record reflects that the

surgery was generally successful in relieving the symptoms."  (*Id.* at 121.)  Plaintiff generally

advances an argument that the ALJ makes findings based on her "lay speculation of the medical

evidence," explaining that "[w]ithout having any explanation of the ALJ's reasoning at step four,

there is a real possibility that the determination is grounded in such speculative inferences."  (Pl.'s

Moving Br. 29 (quoting *Plummer*, 186 F.3d at 429 ("[A]n ALJ may not make speculative

inferences from medical reports.")).)  The ALJ's decision is based on the fact that Plaintiff "was

able to perform work activities in August 2016, lifting up to 35 pound containers, which is

inconsistent with a finding of disability.  The fact that the impairments did not prevent the claimant

from working at that time strongly suggests that it would not currently prevent work." (*Id.* at 121.) Second, the ALJ finds that the "April 2019 follow-up notes show ongoing complaints of right shoulder instability and a decreased range of motion, but physical examination demonstrated good grip strength, good wrist and finger control, and recommendation was a series of exercises and activity modifications." (*Id.* (citing 828-29).) However, the ALJ does not note that the series of exercises and activity modifications were provided by Dr. Abrams "[f]or now" pending Workman's Comp approval of a further surgery, "anterior stabilization utilizing Achilles tendon" following Dr. Abrams' finding that Plaintiff's "anterior apprehension is significant." (*Id.* at 828.) Therefore, the Court finds that the ALJ's determination is not supported by substantial evidence.

The RFC finding that Plaintiff is capable of light work is rendered without consideration for Plaintiff's subjective complaints of pain, specifically, the indication that involves Plaintiff is capable of lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds. *See supra* note 2; see also 20 C.F.R. §§ 404.1567(b); 416.967(b). At the second hearing, Plaintiff affirmatively stated that he is unable to lift any weight using his right arm, and that he is unable to lift things using both arms together, and that he's "not even in the stage of [his] therapy where [he's] allowed to lift any weight whatsoever." (AR 140.) Though the ALJ confirmed with the VE that a limitation that an individual "never carries anything more than five pounds on that right arm," would eliminate all three of the selection jobs, in addition to all other jobs in the national economy at the light level (*see id.* at 152), the ALJ does not discuss this problematic assertion (*id.* at 120). Instead, the ALJ summarily concludes that "[t]he undersigned has considered all of the claimant's statements about his symptoms, such as pain, and any description provided about how the symptoms affect the claimant's activities of daily living and ability to work." (*Id.*)

23

"The Third Circuit has established the following four-part test to determine the credibility of a Social Security claimant's subjective complaints." *Stibgen v. Comm'r of Soc. Sec.*, No. 20-568, 2021 WL 457886, at *3 (D.N.J. Feb. 9, 2021). First, "that subjective complaints of pain be considered seriously, even where not fully confirmed by objective medical evidence." *See Ferguson v. Schweiker*, 756 F.2d 31, 37 (3d Cir. 1985) (citing *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981) & *Bittel v. Richardson*, 441 F.2d 1193, 1195 (3d Cir. 1971)). Second, "that subjective pain 'may support a claim for disability benefits, *Bittel*, 441 F.2d at 1195, and 'may be disabling,' *Smith*, 647 F.3d at 972." *Id.* Third, "when such complaints are supported by medical evidence, they should be given great weight." *Id.* (citing *Taybron v. Harris*, 667 F.2d 412, 415 n.6 (3d Cir. 1981)). Finally, "where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence." *Id.* (citing *Green v. Schweiker*, 749 F.2d 1066, 1070 (3d Cir. 1984) & *Smith*, 637 F.2d at 972). The ALJ's disregard of this limitation, which the ALJ explicitly contemplated at the second Administrative Hearing, and the following conclusion are unsupported by substantial evidence.

The Appeals Council's denial of Plaintiff's appeal of this decision found that "the additional medical evidence from Jeffrey S. Abrams, M.D. dated April 9, 2018 through May 3, 2021 . . . does not show a reasonable probability that it would change the outcome of the decision." (AR 2.) The supplemental file includes Plaintiff's Operative Report detailing his December 11, 2019 procedure, including a right shoulder arthrotomy, Achilles tendon allograft with bone grafting to the glenoid, and rotator cuff revision repair (*see id.* at 39-44); follow-up treatment notes (see id. at 27-35); physical therapy notes indicating that Plaintiff stopped treatment during the COVID-19 pandemic, due to his asthma (*see id.* at 66-104); and the inclusive April 27, 2021 ultrasound (*see id.* at 11), ordered because, as Dr. Abrams stated on May 4, 2021, Plaintiff "has

remained symptomatic, which has not improved" (*see id.* at 12).  This evidence affirmatively demonstrates that Plaintiff's shoulder continues to require surgical intervention, and that his symptoms and complaints of pain have not abated.

**IV.**   <u>**CONCLUSION**</u>

For the foregoing reasons, and for good cause shown, the Commissioner's decision to deny Plaintiff benefits shall be reversed.  The ALJ's decision will be vacated, and the matter will be remanded to the ALJ for further proceedings consistent with this Memorandum Opinion.  An appropriate Order follows.

**Dated**: February 28 , 2023

GEORGETTE CASTNER
United States District Judge